OPINION OF THE COURT
Sheldon S. Levy, J.
Does the antisepsis of gratuitous, noncustodial Miranda warnings, with an attendant waiver, cleanse a custodial interrogation taking place within two hours thereafter? The issue has not been dealt with previously in the reported cases.
Defendant, age 15, was indicted as a juvenile offender on one count of assault in the first degree. The charge involves an alleged gang attack with the use of a knife upon the complaining witness on September 22, 1979, resulting in serious physical injury.
Defendant moves, pursuant to CPL 710.20 (subd 3) to suppress all oral statements allegedly made by him in connection with the subject accusation. The People have the burden of proving beyond a reasonable doubt that statements were voluntarily made before the admissibility of any can be sanctioned.
The credible and pertinent evidence adduced reveals that, when the investigating detective was given the name of the defendant as one of a number of possible assailants, he requested the defendant and his mother to appear at the precinct station house for an interview.
When the defendant and his mother arrived on October 16, 1979, at about 4:00 p.m., the detective escorted them to a specially designated youth room on the main floor and informed them that defendant was a suspect in an assault case and that there was a potential witness. The officer then proceeded to give defendant, in the presence of his mother, full Miranda warnings, which both defendant and his mother acknowledged and defendant voluntarily waived. When defendant stated, "Get your witness; go ahead and get the guy who’s accusing me”, the detective told them he would try to arrange an immediate lineup and showed them to a waiting room upstairs.
*793 Thereafter, in less than two hours, four stand-ins were secured; the complainant arrived; and a fair, proper and nonsuggestive lineup was conducted. The victim definitely identified the defendant as one of his assailants and, apparently, as the one who had wielded the knife. The detective then took the defendant into custody, told him he had been identified as one of the perpetrators, placed him under arrest, and returned the defendant and his mother to the youth room.
At that time, without affording defendant any new or additional Miranda warnings, the arresting officer asked the defendant, “Now, do you want to tell me what happened?” The defendant thereupon, and in the presence of his mother, made the prime statements sought to be suppressed.
Upon the conclusion of this Huntley hearing, the prosecution — in a role reversal — argues that even the first interview was custodial in nature and that, in all events, Miranda admonitions need not be repeated once given and an initial waiver secured. The defense asserts, simply and without detail, that the defendant should have been informed again of his constitutional rights before the renewed questioning.
With respect to the type of custody involved in the initial contact and original meeting, although an invitation to appear at a police station may contain veiled implications of necessity (see People v Byers, 71 AD2d 77, 80), there is no showing here that the defendant’s appearance thereat was anything but voluntary and inquisitive (see Schneckloth v Bustamonte, 412 US 218, 247-249).
Moreover, the first brief communications between the detective and the defendant and his mother in the youth room were more informational than interrogative. After imparting the news to defendant that he was a suspect in an assault case and that there was an available witness, the officer immediately recited the Miranda warnings and obtained a knowing and voluntary waiver of rights from defendant. Defendant, in fact, testified himself that he had heard these warnings before "on TV and everything” and that he was not a novice in the criminal justice system. Upon the commencement of actual interrogation, defendant made no incriminating statements, but only requested a confrontation with the People’s alleged witness.
At no juncture during that initial interview, when the required admonitions were afforded, was the defendant under *794 restraint or arrest. Moreover, at all times, the defendant’s mother was present; only a single detective in plainclothes was with them in a room pointedly arranged for the questioning of minors; and neither the atmosphere nor the substance of the conversation following the warnings was coercive or pervaded with police procedures.
In addition, the test of custody is not whether the defendant considered himself to be confined but "whether a reasonable person, innocent of any crime, would have felt free to leave” (People v Harris, 48 NY2d 208, 215; see, also, People v Rodney P. [Anonymous], 21 NY2d 1, 8-10). Even a suspect’s awareness that the authorities already have incriminating evidence against him does not render an interrogation custodial (Matter of Kwok T., 43 NY2d 213, 219-220). Furthermore, although the defendant was not actually informed that he was free to leave, all of the circumstances would have strongly suggested such a possibility as a reasonable alternative. Nor was the defendant "otherwise deprived of his freedom of action in any significant way” (Miranda v Arizona, 384 US 436, 444).
In point of fact, the defendant and his mother were at liberty to depart the station house at any time before the defendant was selected at the lineup procedure (see Oregon v Mathiason, 429 US 492, 495). It is apparent, however, that neither had any inclination to adopt this course and that the defendant was anxious to test the detective’s statement that he had a witness who could involve the defendant as one of the assailants.
Therefore, although the essence of the subject conversation was surely noncustodial, the prosecution, strangely enough, still attempts to assert that all questioning of the defendant from its inception was custodial. In this regard, and despite the People’s heavy burden of proof on this type of hearing, the trial assistant argues against affording full credibility to his sole witness, at least with respect to his testimony concerning the nature of the initial interrogation. There is, however, a "method to the madness” of the prosecution’s contentions.
A defendant in custody who initially has been adequately "Mirandaized” and has properly waived, need not be warned again prior to subsequent questioning, even if the later interrogation takes place hours thereafter (People v Johnson, 49 AD2d 663, affd 40 NY2d 882; People v Caruso, 45 AD2d 804; People v Manley, 40 AD2d 907; People v Woodson, 87 Misc 2d 575, and cases cited therein). If the questioning of the defen *795 dont here occurred during one continuous custodial confinement without significant interruption, the statements made by him some two hours after the initial meeting, albeit without further warnings, would undoubtedly be admissible upon trial.
Nevertheless, despite the "switch-hitting” of the prosecutor and the ingenuity of his proposal, it is perfectly clear, as previously detailed, that the first interrogation was purely noncustodial in form and substance, and I so find.
Accordingly, since the dictates of Miranda do not apply to noncustodial interrogation (Miranda v Arizona, 384 US 436, supra), the legalistic catechism provided this defendant originally was plainly gratuitous. His waiver therof was merely an interesting, but unnecessary, gesture under all of the circumstances. The defendant was not in custody, and the right to preinterrogation warnings and to the effective assistance of counsel did not attach at that time. Any statements made by the defendant during the initial interview were clearly voluntary and would have been available at trial.
Nor may police officials take advantage of their own derelictions in failing to give Miranda admonitions at proper times by reference back to warnings provided upon an occasion when none were needed. This is especially true where, as here, in the period between noncustodial and cutodial interrogation, a lineup procedure was undertaken; a group of stand-ins was secured; the defendant appeared in the lineup; he was specifically identified as one of the perpetrators of a serious crime; and he was thereupon taken into custody. Providing a defendant with Miranda warnings when unwarranted, cannot obviate the practical necessity and legal requirement for furnishing a further set at a time when the need is most obvious. Whatever considerations may have been in the defendant’s mind at the time of his initial waiver of the right to an attorney’s presence at the original interview, could not be said to have remained unaltered after the traumatic interim experiences (see, also, People v Sanchez, 88 Misc 2d 929, 936).
A nebulous suspect status is one thing. A formalized identification procedure and a subsequent arrest thereon is quite another. Whereas a person who is merely told of an accusation against him of complicity in illegality may not feel any compulsion to seek forthwith the advice or protection of a member of the Bar and may readily waive counsel appearance at that time, one who is carefully selected by a complainant as a prime criminal perpetrator and is then subjected to arrest *796 procedures may not be as willing to forego the wisdom or hand-holding ability of an attorney and may truly desire to consult with counsel before being exposed to custodial interrogation.
Moreover, in my view, it would be difficult indeed to envision a defendant whose mental attitude towards the need for an attorney might not have been altered solely by virtue of a formal arrest. Any knowing and intelligent waiver of an attorney’s presence that might have occurred previously during voluntary and noncustodial questioning, could not be presumed to continue on the same basis once a defendant is in custody on specific charges. Where the prior interview and interrogation has been plainly in a noncustodial setting, where Miranda warnings have been gratuitously afforded, but where the defendant has made no incriminating statement, an intervening arrest of the defendant alone should be a sufficient change of circumstances to trigger a standard requirement for giving such admonitions anew and for securing again a competent waiver of counsel, if a custodial interrogation is then to be initiated. It cannot be inferred that a person, who has just been arrested and whose physical state has been changed from noncustodial to custodial, would have the same predilections towards the need for counsel so that a prior waiver would constitute a continuing waiver.
At the least, such a person should and must be given an initial or renewed choice at the start of in-custody questioning, so that, if there is ultimately a waiver of the constitutional right to counsel appearance and consultation, it can be said with impunity and sincerity that it was accomplished in a freely prescribed and informed fashion.
How can any court hold that a defendant knowingly, intelligently and voluntarily waived rights available to him at the threshold of custodial interrogation, if he was never told of such rights at or after the point where custody commenced?
A waiver of privileges against self incrimination and the right to the presence of an attorney during such interrogation may not be assumed, presumed or lightly inferred (Johnson v Zerbst, 304 US 458). Although there is no specific language or verbal formula required to constitute such a relinquishment of constitutional rights (see North Carolina v Butler, 441 US 369), there must be minimally a free, understanding and informed waiver upon the threshold of in-custody interrogation, sufficient to satisfy the requirements of due process, *797 appropriate under all the circumstances, and evidenced, upon a suppression hearing, by proof beyond a reasonable doubt. It is when noncustodial questioning becomes custodial that such a threshold is reached and when preinterrogation warnings must first be given or repeated. Anything less would be a clear violation of defendant’s constitutional rights and of the Miranda rationale itself.
True enough, many is the situation where that precise point of custody is not readily discernible to a police officer busily engaged in the performance of mandated duties, whether of an interrogative nature or otherwise. It is much easier, of course, for a court upon a Huntly hearing, with the wisdom of retrospection, to declare if and when custodial interrogation first commenced and to grant or deny suppression motions based upon ultimate findings in this regard.
Nor can any accusation ever be leveled against a law enforcement official who opts for providing a defendant with all of his constitutional rights and privileges — even at a time when there is doubt as to absolute necessity. Where there is any question as to whether to give Miranda warnings or not, the better procedure is obviously to observe scrupulously the old adage: "Better to be safe than sorry.”
In this case, however, the exact time when previous noncustodial questioning became custodial interrogation was clearly apparent. After the defendant was decisively identified by the victim as one of the perpetrators of the assault and defendant was immediately formally taken into custody and arrested, there could be no doubt that any succeeding or continued questioning of the defendant thereafter would be purely and plainly custodial.
In this type of situation then, after a defendant has been identified and arrested, there can be no excuse for the interrogating officer not to initiate or to renew Miranda admonitions before initial or further questioning.
In all, warnings issued without custody or even when custody is in issue cannot serve to circumvent the proper prerequisites to custodial interrogation, and needless monitions of freedom can never substitute for the caveats of constraint.
For the reasons stated, the motion to suppress is granted as to all oral statements following the lineup and arrest and is otherwise, in all respects, denied.